Judge Carr
delivered his opinion.
The appellee sued the appellant for freedom. The plead-' ings are in the usual form, putting the question of freedom in issue. The case comes up on two exceptions taken by the defendant to the opinion of the Court.
1. The plaintiff proved by two witnesses, that he is the son of Biddy, who was the daughter of Sibyl: that Sibyl was a copper-coloured woman, with long, straight, black hair, with the general appearance of an Indian, except that she was too dark to be of the whole blood: that she was called Indian Sibyl; but her color, and that only, shewed she had negro blood. He also introduced the deposition of Smith, who said, that when a boy, (between 7 and 10,) he knew a yellow woman in the family of Ashbrooke. She *614 was called ,dshbrooke’s old Sibyl and Indian Sibyl. She had every appearance of an Indian; long, straight, black hair; and he was always under the impression that she was of Indian -descent. After the introduction of this evidence, the plaintiff offered to prove, that in the life-time of Sibyl, about the year 1770, it was currently said, and believed in the neighbourhood, that she was entitled to her freedom; to the introduction of which evidence, the defendant objected. But, the Court was of opinion, that though such evidence' was not legal evidence to prove the affirmative position that Sibyl was free, it was legal and proper evidence, as a circumstance with others, to aid the jury in deciding whether the African mixture in Sibyl came from the father or mother, and for that purpose only, and to have such weight as the jury deemed it entitled to. The ■ plaintiff was allowed to give the said evidence.
2. The second exception is substantially this: After argument of the cause, the defendant’s counsel, stating the amount of the evidence to be, that the plaintiff was son of Biddy, who was daughter of Sibyl, who was half Indián, half negro, moved the Court to instruct the jury, that it was necessary for the plaintiff to prove, that Sibyl was descended in the maternal line from an Indian woman. But, the Court said, that it is true the jury must find that fact, but that the Court would not instruct the jury, that further evidence to prove it, was of legal necessity, to be given by the plaintiff: that it was a question to be decided on probabilities and circumstances, among which it was lawful for the jury to consider facts connected with the history of the country, as if formally proved to them; and if, at the time spoken of, it was much more common for female Indians to be captured, and domesticated among us than males, that circumstance might be regarded by them of some weight, and in the case before them, they should attentively consider all the circumstances, and find for the plaintiff, if they believed Sibyl’s mother was an Indian woman; otherwise, they should find for the defen dant.
*615 The question presented by .the first bill of exceptions is, in my mind, a very important one. In Shelton v. Barbour, 2 Wash. 64, the President remarks, “that although liberty is to be favoured, the Court cannot, on that, or any other favored subject, infringe the settled rules of law.” In Pegram v. Isabel, 2 Hen. & Munf. 193, Judge Roane repeats these remarks verbatim, and adds, “ This decision, therefore, shuts out the pretence, that we can, in this case, take a greater latitude in relation to the rules of evidence, than in any other.” In Mima Queen and Child v. Hepburn, 7 Cranch’s Rep. 290, the Chief Justice, delivering the opinion of the Court, says, “ However the feelings of the individual may be interested on the part of a person claiming freedom, the Court cannot perceive any legal distinction between the assertion of this, and any other right, which' will justify the application of a rule of evidence to cases of this description, which would be inapplicable to general cases, in which a right of property may be asserted.” I have thought it proper to state these authorities, in order to fortify the mind against that bias we so naturally feel, in favor of liberty.
This, then, is a general question on the law of evidence. It is well remarked by Lord Kenyon in Rex v. Eriswell, 3 Term. Rep. 707, that “ all questions upon the rules of evidence are of vast importance to all orders and degrees of men. Our lives, our liberties and our property are all concerned in the support of these, rules, which have been matured by the wisdom of ages, and are now revered from their antiquity, and the good sense in which they are founded. They are not rules depending on technical refinements, but upon good sense; and the preservation of them is the first duty of Judges.” Among these rules, none is more firmly fixed, or rests on a more solid foundation, than this ; “that hearsay evidence is in its very nature inadmissible. It violates the fundamental principles which ordain, that any fact which is to affect a person should be proved by a tvitness sioorn to speak the truth, and tes *616 tifying in the presence of the party, that he may cross-examine him. It generally supposes better evidence behind; and even where this is not the case, its intrinsic weakness, its incompetency to satisfy the mind of the existence of the fact, and the frauds which might be practised under its cover, combine to support the rule, that hear-say evidence is totally inadmissible.” To this rule, however, there are some few exceptions, which, the books tell us, are as old as the rule itself. These are cases of pedigree, prescription, custom, and in some cases of boundary. These exceptions were no doubt admitted, under the idea that they resulted from the necessity of the case; but Courts have been fearful, (and with good reason,) lest they should let in many mischiefs, and have guarded strongly against, enlarging them. This subject is very ably discussed in the case of The King v. The Inhabitants of Eriswell; and though, in that case, the Judges were equally divided, it will be seen by the cases of Rex v. The Inhabitants of Nuneham Courtney, 1 East. 373, and Rex v. Ferryfrystone, 3 East. 54, that the question has been entirely settled in favor of the opinion of Grose and Lord Kenyon, who were opposed to the introduction ofhearsay evidence. Grose remarks, “I dread that rules of evidenceshouldever depend on the discretion of Judges. I wish to find the rule laid down, and to abide by it; and nothing but a clear incontrovertible decision upon the point, and not the concession of counsel, or the obiter dictum of a Judge, ought to form an exception to a general rule of law, framed in wisdom by our ancestors, and adopted in every case, except where the exception is as ancient as the rule.”
Lord Kenyon also, speaking of the necessity of defining the exceptions to the rule strictly, adds; “ For, unless that is done, I am much afraid we may endanger a rule of infinite importance to every individual, and by suffering exceptions to creep on, one after another, leave nothing like a rule.” In the case before cited from 7th Cranch, Judge Marshall, after laying down the rule and the exceptions, *617 adds; “ But if other cases, standing on similar principles, should arise, it may well be doubted whether justice, and the general policy of the law, would warrant the creation of new exceptions. The danger of admitting hear-say evidence, is- sufficient to admonish Courts of Justice against lightly yielding to the introduction of fresh exceptions to an old and well established rule, the value of which is felt and acknowledged by all. If (he adds) the cii’cumstance that the eye-witnesses of any fact be dead, should justify the introduction of testimony to establish that fact from hearsay, no man could feel safe in any property, a claim to which might be supported by proof so easily obtained.”
- If I have dwelt longer on this point, than might seem necessary, it is because of my anxiety (by the aid of these great names) to impress deeply a sense of the mischiefs, which may result from enlarging the exceptions to this ancient and venerable rule.
The question before us, is a case of pedigree. The object was, to trace back the descent of the plaintiff, through the maternal line, to an Indian woman. The evidence offered was, that about the year 1770, it was currently reported and believed in the neighbourhood, that Sibyl, the maternal grand-mother of the plaintiff, was entitled to her freedom; and the Court said, that this was legal and proper evidence, as a circumstance with others, to aid the jury in deciding, whether the African mixture in Sibyl came from the father or mother. To ascertain the correctness of this opinion, let us examine a little the extent to which the exception has gone, in cases of pedigree.
In Rex v. Eriswell, (before, cited,) Lord Kenyon says, “ I admit that declarations of the members of a family, and perhaps, of others living in intimacy with them, are received as evidence as to pedigrees; but evidence of what a mere stranger has said, has always been rejected in such cases.”
In Vowles v. Young, 13 Ves. 140, an issue had been directed out of Chancery, in the trial of which, upon a *618 question of pedigree, what a husband had said as to the legitimacy of his wife, was offered in evidence. The law Judge rejected it, on the ground that the husband did not come within the rule, which limited the evidence to members of the family of the person, whose descent was to be traced. A motion was made to Lord Chancellor Erskine for a new trial, on the ground of mis-direction; and he granted i-t, thinking the husband clearly within the rule. He says, “The law resorts to hear-say of relations upon the principle of interest in the person, from whom the descent is to be made out; and it is not necessary that evidence of consanguinity should have the correctness required as to other facts. If a person says another is his relation or next of kin, it is not necessary to state how the consanguinity exists. It is sufficient that he says A. is his relation, without stating the particular degree, which, perhaps, he could not tell, if asked. But, it is evidence from, the interest of that person in knowing the connections of the family: Therefore, the opinion of the neighbourhood, or what passed among acquaintance, will not do.”
This point is again stated in the case of Whitlocke v. Baker, 13 Ves. 511, where Lord Eldon says, “I accede to the doctrine of Lord Mansfield, as it has been stated from Cowper, 591; but it must be understood as ithasbeen practised and acted upon; and one word in that passage wants explanation. It was not the opinion of Lord Mansfield, or of any Judge, that tradition generally is evidence of pedigree; the tradition must be from persons having such a connection with the party to whom it relates, that it is natural and likely, from their domestic habits and connections, that they are speaking the truth, and that they could not be mistaken. The whole goes upon that. Declarations in the family, descriptions in wills, descriptions on monuments, descriptions in bibles and registry books; all, are admitted upon the 'principle that they are the natural effusions of a party, who must know the truth, and who speaks upon an occasion, when his mind stands in an *619 even position, without any temptation to exceed or fall short of the truth. But, there may be many eircumstances forming part of the tradition, which you would reject, taking the body of the tradition.” From these authorities it would seem, that the exception which tolerates hearsay in cases of pedigree extends only to the hear-say of those who, by connection and consanguinity, have both the means of knowing, and an interest in making themselves acquainted with, the facts of which they speak, and does not take in every neighbourhood rumor or report. If some of the cases heretofore decided in this Court, on the subject of freedom, should seem to have overstepped these limits, it is by no means my purpose to disturb or unsettle what they may have decided. I have merely attempted to shew what is the rule. The Court has always professed in these cases, as in others, not to intend a departure from settled rules. The doctrine was not particularly laid down in those cases. The opinion in the case before us, seems to me to have gone a step beyond any former decision, and it is to shew its error that I have stated the exception to the general rule.
Suppose we allow the greatest extent to this exception, that any of the cases give, and admit that in the case of persons claiming freedom by descent, through the female line, from Indian ancestors, general report of the neighbourhood should be admitted; still, it must be general report as to pedigree. In the case before us, it should be a general report that old Sibyl was the child of an Indian woman. But, there was no such evidence here. The evidence offered and objected to was, that it was the current belief of the neighbourhood, that Sibyl was entitled to her freedom. What was the ground of that belief, no where appears. Was it a knowledge in the neighbours, that Sibyl was the daughter of an Indian woman ? If so, that would naturally have been stated as the reason. Or, was it her appearance, copper color, and long hair ? These, we know, she might as well have derived from an In *620 dian father as mother. Or, was it an idle rumor, which, like a thousand others, had' no foundation at all ? Suppose a man were to bring suit for a tract of land, claiming it by a descent from a remote ancestor. He proved that he was the son of A., who was the son of B.; but here the proof of descent stopped, being still short of the ancestor. To supply the defective links in the chain, however, proof was offered that it was the current belief of the neighbourhood, some .fifty or sixty years past, that B. was entitled to the land. Would this be received as evidence, that B. was descended from the ancestor, so as to complete the chain of descent ? I do not think this would be contended for; and yet the two cases seem to me exactly parallel.
The ease of Mima Queen v. Hepburn, before cited, was, like this, a question of freedom; and evidence, very much of the character of that offered here, was rejected by the Court below, and a writ of error brought before the Supremé Court, where the judgment was affirmed; the Chief Justice delivering a clear and strong opinion, from which I have already quoted several passages.
Again. In Negro John Davis, &c. v. Wood, 1 Wheat. 6. Error on judgment of the Court below, rendered against the plaintiffs, who in that Court were petitioners for freedom. They excepted to the opinion of the Court, stating that they had offered to prove by competent witnesses, that they (the witnesses) had heard old persons now dead, declare that a certain Mary Davis, now dead, was a white woman born in England, and such was the general report of the neighbourhood where she lived; and also offered the same kind of evidence to prove that Susan Davis, mother of the petitioners, was lineally descended in the female line, from the said Mary; which evidence by hear-say and general reputation, the Court refused to admit, except so far as it was applicable to the fact of the petitioner’s pedigree. The counsel for the plaintiffs in error, referred to the case of Mima Queen and Child v. Hepburn, remarking, that unless the Court was disposed to re-view its *621 decision, it must be taken for law; and he could not deny its authority. The Chief Justice delivered the opinion of the Court, and stated, that as to the first exception (the one I have stated,) the Court had revised its opinion in Mima Queen v. Hepburn, and confirmed it. These two cases clearly decide, that though evidence by hear-say and general reputation be admissible as to pedigree, it is not admissible to prove the freedom of the plaintiff’s ancestor, and thence to deduce his own. I conclude on this point, that the admission of the evidence in the case before us, was erroneous, whether we consider the exception as it seems to be confined by the English cases, to the hear-say of relations and connections; or, extended by our own and the cases in the Federal Court, to general report and reputation.
It remains to consider the second bill of exceptions. The Court was asked to instruct the jury, that it was necessary for the plaintiff to prove the descent of Sibyl in the maternal line, from an Indian woman. Such proof was certaitdy necessary, and it seems to me that the Court ought to have said so, without further comment. But the Court said it was true' the jury must find that fact, but that the Court would not instruct them that further evidence to prove it was necessary, but simply that the fact must be proved.. The Court went on to remark, that it was a question to be decided upon probabilities and circumstances, among which it was lawful for the jury to consider facts connected with the history of the country, as if formally proved to them.
I have two objections to this part of the instruction. 1. That it was not called for by the motion, and seemed calculated, (though I am sure the worthy Judge had no such intention,) to influence the jury on the evidence. 2. That t was not, (if I understand it aright,) correct in point of law. “ The jury may consider facts connected with the history of the country, as if formally proved to the?n.” This, I presume, cannot mean that the jury are to consider *622 such facts as if formally proved, when proved; but, that without proof they are to consider them as if formally proved; that is, that each juror might take any facts as formally proved, which'he might have heard of in a way to satisfy his mind, and. might consider as connected with the history of the country. If this be the meaning, (and I can see no other,) it is contrary to law; for, it is laid down in all the books, that there must be some proof adduced of historical facts. In the case of Mima Queen v. Hepburn, Judge Marshall says, “ There are also matters of general and public history, which may be received without that full proof, which is necessary for the establishment of a private fact.”
In Stainer v. The Burgesses of Droitwich, Salk. 281, an issue was directed out of Chancery, wherein the question was, whether by the custom of Droitwich, salt pits could be sunk in any part of the town, or in a certain place only; and upon the trial at bar, Camden’s Britannia was offered in evidence, but refused. For, the Court held, that “ a general history might be given in evidence to prove a matter relating to the Kingdom in general, because the nature of the thing requires it, but not to prove a particular right or custom. ” Surely, there ought to have been some evidence adduced of any facts contended for as historical. The jury should all have had the same proof to act upon, and not to be left, each to his own stock of information, whether scanty or abundant, correct or erroneous.
The Court go on to say, that “ if, at the time spoken of, it, was much more common for female Indians to be captured and domesticated among us than males, that circumstance might be regarded by the jury as of some weight. ” This is very vaguely expressed; and there is always danger in such cases, of mis-leading the jury. “ The time spoken of” What time? There is nothing to specify. If the Court meant the time when Sibyl’s mother, (taking her to have been an Indian,) was brought into the country, when was that? From the record it would seem, that Sibyl, about *623 the year 1760, must have been at least fifty years old, as she was then called old Sibyl. This would carry back the time of her birth to 1710. But, how old her mother then was, or when brought into the country, (if brought in at all,) there is not a single fact in the cause, to give us the slightest information. — Again. What was the evidence, on which the jury was to decide, that it was more common to capture females than males at this period, so vaguely alluded to? None is stated; none in the record. The jury might conclude, that being one of the historical facts before mentioned, they might- take it as formally proved, without any evidence being adduced to them; or, they might suppose that they were at liberty to weigh probabilities; and if to their understanding, it seemed more likely that women should be captured than warriors, to conclude that the fact was so in the case before them. It was wrong, I think, to commit the jury to this vague course of surmise and conjecture.
The last part of this instruction is, that the jury should find for the plaintiff, if they believed Sibyl’s mother was an Indian woman. I think this was laying down the law too broadly. Taking Sibyl to have been born about the year 1710, and her mother to have been thirty at her birth, she would have been born in 1680, and might have been brought into the country under the law of Í682, permitting Indians to be held in slavery. This act, we know, was in force till repealed (as the Courts have decided) by the -act of 1691, permitting free trade with the Indians. It would have been going far enough, I think, if not too far, to have told the jury, that if they believed that Sibyl was the daughter of an Indian woman, it was prima facie evidence of freedom, and threw on the other party the bur-then of proving, that she was properly held in slavery or service; for, there were laws allowing this latter. It will be observed that the motion, under which this instruction was given, was made by the defendant, who did not ask the Court to say, that proof of Sibyl’s being the daughter *624 of an Indian woman was sufficient; but, that such proof was necessary for the plaintiff to support his action. The two things are very different.
Upon the whole, my opinion is that the Court erred in both the instructions excepted to; and that the judgment should be reversed, and the case sent back for a new trial, on which such instructions are not to be given.
Judge Green.
It appears by the bills of exceptions, that the plaintiff was the son of Biddy, who was the daughter of Sibyl: that the latter, about the year 1760, was called old Sibyl and Indian Sibyl, was a copper-coloured woman, with long, straight, black hair, with the general appearance of an Indian, except that she was too dark to be of the whole blood; and her color shewed that she was half Indian and half negro; and that about 1770, it was currently said and believed in the neighbourhood, that Sibyl was entitled to her freedom; which latter evidence the Court admitted, not as legal evidence to prove that Sibyl was free, but as legal and proper evidence of a circumstance, with others, to aid the jury in deciding whether the African mixture in Sibyl came from the father or mother, and for that purpose only, to have such weight as the jury deemed it entitled to. The Court also instructed the jury, that although it was necessary to justify the jury in finding for the plaintiff, that Sibyl descended, in the maternal line, from an Indian woman, the Court would not instruct them (although asked to do so by the defendant,) that further evidence to prove it, was of legal necessity, to be given by the plaintiff: that it was a question to be decided on probabilities and circumstances; amongst which, it was lawful for the jury to consider facts, connected with the history of the country, as if formally proved; and if, at the time spoken of, it was much more common for female Indians to be captured and domesticated among us, than males, *625 that circumstance might be regarded by them of some weight; and in the case before them, they should attentively consider all the circumstances, and find, for the plaintiff, if they believed that Sibyl’s mother was an Indian woman; otherwise, they should find for the defendant-
To determine upon the propriety of these decisions, it will be proper to enquire in what cases Indians, under our laws, could be held as servants, and in what, as slaves.
An act of 1655, 1 Hen. Stat. at Large, 410, provided, that all Indian children might be taken as servants with the consent of their parents, for such term as might be agreed upon, provided the covenants for service were confirmed before two justices of the peace, and that they be brought up in the Christian religion.
In 1657-8, Ibid. 455, it was enacted, that the service of such children should not be transferred to any other, and that they should be at their own disposal at the age of twenty-five. These are the only acts relating to voluntary contracts of service.
An act of 1661-2, 2 Hen. Stat. at Large, 143, provided, that what Englishman, trader or other, shall bring in any Indians as servants, and shall assign them over to any other, shall not sell them for slaves, nor for any longer time than English of the like ages should serve by Act of Assembly, (if above sixteen, five years; if under, until they attain the age of 24;) and no one was to entertain any of the neighbouring Indians as servants, without license of the Governor.
In 1670, 2 Hen. Slat, at Large, 2S3, an act recites, that whereas some disputes have arisen, whether Indians taken in war by any other nation, and by that nation that taketh them, sold to the English, are servants for life or. term of years; and enacts that all servants, not being Christians, imported into this colony by shipping, shall be slaves for their lives; but what shall come by land, shall serve, if boys or girls, until thirty years of age; if men or women, twelve years and no longer. This act was *626 the first that alludes to the question of the slavery of Indians under any circumstances, and was made to remove a doubt whether those taken in war by other nations, and s°ld, to the English, were slaves or not.
There are several indications that Indians, before this time, were held in slavery. In 2 Hen. Stat. at Large, 155, (1661-2,) there is an order of the Assembly discharging Metappin, a Powhatan Indian sold for life to Elizabeth Short, by the King of the Wainoake Indians, because he had no power to sell him, being of another nation; and in 1670, an act passed, reciting- that it hath beei\ questioned whether Indians or negroes manumitted, or otherwise free, could be capable of purchasing Christian servants; and enacting that no negro or Indian, although baptised,'and enjoyingdheir own freedom, shall be capable of any such purchase of Christians.
In 1675, war was declared against most of the Indian nations. In 1676, Nathaniel Bacon rebelled, and took possession of the government; and in June of that year, the Assembly passed a law renewing the declaration of war, and declaring that “ all Indians taken in war be held and accounted slaves during life.” Bacon's insurrection being quelled, all his laws were repealed in February, 1676-7; and most of them re-enacted at the same session; and amongst others, it was ordered, that all such soldiers who either already have or shall hereafter take prisoners any of our Indian enemies, at the time of such taking being under a lawful command, under due and full authority, shall retain and keep such Indian slaves to their own proper use. 2 Hen. Stat. at Large, 404. And in 1679, Ibid. 440, it was enacted that the Indian prisoners taken in war, shall be free purchase to the soldier taking the same.
In 1682, 2 Hen. Stat. at Large, 490, an act was passed, reciting, amongst other things, that “ those Indians that are taken in war or otherwise, by our neighbouring Indians, confederates or tributaries to his Majesty, and this, his plantation, are slaves to the said neighbouring Indians that *627 so take them, and by them are.sold to his Majesty’s subjeets here as slaves; repeals the act of 1670 in express terms, to all intents and purposes, and enacts, that all ser vants, except Moors and Turks, in amity, &ie. which, from and after the publication of this act, shall be brought or imported into this country, either by sea or land, whether negroes, Moors, mulattoes or Indians, who and whose parentage and native country are not Christian, Sic. and all Indians which shall be hereafter sold by our neighbouring Indians, or any other trafficing with us, as for slaves, are hereby adjudged, deemed and taken to be slaves, to all intents and purposes.” The next act declares, that Indian women servants, sold to the English, above the age of 16, are tithable.
In 1691, 2 Hen. Stat. at Large, 69, an act passed declaring a free trade for all persons, at all times, at all places, and with all Indians whatsoever. Until this time, there had been continually restrictions in various degrees, upon the trade with the Indians. This statute was re-enacted in 1705, and the General Court in 1777 decided, that after this act no American Indian could be enslaved; and the Court of Appeals have repeatedly affirmed the same proposition; which,-however, does not affect the condition of those Indians and their descendants in the female line, who were slaves before the passing of the act.
In 1691, 3 Hen. Stat. at Large, 87, it was enacted, that any English woman, whether free or a servant, having a bastard child by a negro or mulatto, the child should be bound out by the church-wardens as a servant, until the age of 30 years. This does not apply to the case of an Indian woman servant; but, is mentioned only for the understanding of the subsequent laws.
By the-act of 1705, 3 Hen. Stat. at Large, 453, it was provided, that if any woman servant, or free Christian white woman, had a bastard child by a negro or mulatto, the child should be bound out by the church-wardens, until 31 years old. This extended to the case of such a has *628 tard child of an Indian woman servant. An act of 1723, 4 J/m. ¿Azi. ai Large, 133, provided, that “ when any female mulatto or Indian, by daw obliged to serve to the age of 30 or 31 years, shall, during the time of her servitude, have any child, every such child shall serve the master or mistress of such mulatto or Indian, until it shall attain the age the mother of such child was obliged by law to serve unto.” This statute was re-enacted verbatim, in 1753, 6 Hen. Stat. at Large, 357; except that it mentions only those mulatto or Indian servants, by law bound to serve to 31 years, not noticing those bound to serve to 30 years.
An act of 1765, 8 Hen. Statutes at-Large, 134, 135, after reciting, that by the act of 1753, “if any woman servant shall have a bastard child by a negro or mulatto, or if any free Christian white woman shall have such bastard child by a negro or mulatto, the church-wardens were directed to bind the child to be a servant until it shall be 31 years of age, which is an unreasonable severity upon such children,” provides, “ that the church-wardens shall bind out such bastard children already born, and not yet bound out, or which shall hereafter be born, either of white zoomen servants, or of free Christian white women, the males to 21, and the females to 18, and no longer;” and, that “the children hereafter to be born of mulatto women, during the term of their service, who are obliged by law to' serve to the age of 31 years, shall serve the master or mistress of such mulatto woman, the males to the age of 21, and the females to the age of 18 only, and no longer.” An act of 1778, prohibits the enlistment, as soldiers, of “ such servants as are bound to serve to 31 years of age.”
That the act of 1705, included in the general description of “ any woman servant,” female Indian- servants, I think is perfectly apparent from various considerations. First — the expression literally embraces them; and although the Legislature might not have felt the same anxiety to prevent the connection of negro or mulatto men *629 with Indian, as with white women, yet they would feel no greater reluctance to bind the child of an Indian woman servant by a negro or mulatto, to a protracted service, than the child of a white woman by a negro or mulatto. Again: The terms of the act of 1691, “ English woman being a servant,” are dropped, and in their place, the act of 1705 uses the words “ any woman servant;” which could only be for the purpose of including the case of Indian women servants; for, there could be no other than those two descriptions of- servants. But, on this question, the words of the act of 1723, are decisive. They subject any child of any female mulatto or Indian, by law bound to service till the age of 30 or 31, to a service to the same age. What class of persons fell within the description of female mulattoes by law bound to service, till the age of 30 or 31? The definition given by law, of the term mulatto, by the act of 170S, 3 Hen. Stat. at Large, 252, answers this question. That act is in these words: “and for clearing all manner of doubts which may hereafter happen to arise upon the construction of this act, or any other act, who shall be accounted a mulatto, be it enacted, that the child of an Indian, and the child, grand-child, or great grand-child of a negro, shall be deemed, accounted, held and taken to be a mulatto.” This act does not, in terms, state, that to constitute a mulatto, some portion of white blood was necessary; but, that is the necessary construction. For, otherwise a child of a negro by a negro, and of an Indian by an Indian, would have been a mulatto; and after one generation there could have been no Indian or negro, but all would have been mulattoes. Yet, the subsequent statutes speak of Indians and negroes. If, therefore, there was no white blood, the child of an Indian woman, no matter who was the father, was an Indian, and of a negro woman, no matter by whom begotten, a negro; the child belonging to the class of the mother. That this was the effect of the law, will clearly appear hereafter, when we enquire what class of persons was de *630 signated by the word Indian in the act of 1723. By ££ mulattoes by law bound to serve till 30 or 31,” in this act, was meant, the bastard children of white women, whether free or servants, by a negro or mulatto; those born between the passing of the acts of 1691 and 1705, being bound to serve to the age of 30; and those born after the passing of the act of 1705, being bound to serve until 31. No other laws than those of 1691 and 1705, bound any mulattoes to serve until 30 or 31. If the mother was a slave, the child was a slave; if free, the child, in all other cases than those provided for by those acts, was absolutely free. If it were admitted, that the child of a negro and an Indian could be called a mulatto, then no such mulatto was bound, by any law, to serve until 30 or 31, unless the law of 1705 extended to the case of a female Indian servant, having a bastard child by a negro or mulatto. But, the act of 1723, by the term “ Indian bound by lato to serve till 31,” recognized that Indians might, by law, be bound to such service, and provided in relation to the condition of their children born during such service. There was no law, by which an Indian could be bound to such service, unless he or she was a bastard of a female Indian servant by a negro or mulatto, and bound to such service by the act of 1705. The act of 1723, recognizing Indian female servants by law bound to serve till 31, and it being impossible that any other Indians but of that description, should be bound to such service, it follows, that the act of 1723, by Indian servants bound by law to serve till 31, meant the bastard children of Indian women servants, by negroes and mulattoes. No Indian could, in 1723, be bound to such service, except such bastards. The act of 1670, which allowed Indians to be bound to the áge of 30, being repealed by the act of 1682, all those so bound must have been free in the year 1712. The act of 1723, called persons descending from an Indian woman by a negro or mulatto, Indians, and not mulattoes; as did the act of 1753, 6 Hen. Stat. at Large, 357, repeating verbatim the *631 act of 1723. Surely, in 1753, there could be no Indians bound to serve till 31, by law, unless those descended in the female line from an Indian, and in the male line originally from a negro, were so under the act of 1705.
This legal description, designating a descendant of an Indian mother and a negro father, as an Indian, and a descendant of a negro woman and Indian father, as a negro, and neither as a mulatto, was probably, in 1753, and even so late as 1778, (when the law before cited was passed,) familiarly known, and in common parlance, the descendant of an Indian by the female line, and of a negro on the father’s side, was called an Indian; and the descendant of a negro woman in the female line, and of an Indian on the father’s side, was known as, and called, a negro.
In 1785, an act passed, 12 Hen. Stat. at Large, 184, which is still in force, changing the definition of the word mulatto. It enacts that every person, of whose grand-fathers or grand-mothers, any one is or shall have been a negro, although all his other progenitors except that descending from the negro, shall have been white persons, shall be deemed a mulatto; and so, every person who shall have one-fourth part or more, of negro blood, shall in like manner be deemed a mulatto. Since this act, a mixture of Indian and negro blood, if there be one-fourth part or more of negro blood, constitutes a mulatto; but did not, before this act.
The effect of these laws, in respect to the various classes of Indians which might be lawfully held as slaves, or as involuntary servants, or as servants by contract, seems to be, first, as to slaves, that up to 1670, no Indian could be legally a slave. After 1670, and up to the passing of the act of 1778, prohibiting the importation of slaves, all Indians imported by shipping, were slaves; but no Indian brought in by land, could be a slave before the act of 1682, except those taken as prisoners in war by our own troops, under the acts of June, 1676, February, 1676-7, and 1679; after the act of 1682, all brought into this country by sea *632 or land, whose parentage and native country were 'not Christian, or sold by the neighbouring Indians, or any other trafficing with us as for slaves, were slaves. The provisions of the act of 1682, were virtually re-enacted in 1705, and in 1753; the last of which enacts that “allpersons who have been or shall be imported into this colony by sea or land, and were not Christians in their native country, except Turks and Moors in amity with his Majesty, and such as can prove their being free in England, or any other Christian country, before they were shipped for transportation hither, shall be accounted and be slaves, and as such be here bought and sold, notwithstanding their conversion to Christianity after their importation.”
These acts, so repeated in terms, embrace the case of all Indians imported by sea or land, not coming within the exceptions of the acts, and prove that the Legislature had no idea up .to 1753, that the permission to trade with all Indians, allowed by the acts of 1691, and 1705, prohibited the enslaving of all American Indians, as was decided by the General Court in 1777, and repeatedly by this Court since; and so I should have thought, but for those decisions. Even if such a construction of the acts of 1691, and 1705, was otherwise proper, I should have thought that the acts of 1705, and 1753, directly contradicting it, would have prohibited that construction. We have no intimation that the idea that the acts of 1691, and 1705, allowing a free trade with Indians, could have the effect of prohibiting the enslaving of American Indians ever existed until the case decided in 1777, occurred.
Allowing the acts of 1691, and 1705, to have the effect which has been attributed to them, then American Indians coming within the act of 1682, might have been made slaves up to 1691. The Indians, therefore, which could have legally been slaves in Virginia, at the time of Sibyl’s birth, were all foreign Indians brought in by sea since 1670; all taken prisoners in war from 1676, to 1691; and all brought in by land and sold as slaves by Indians or *633 others, from 1682 to 1691, or perhaps, until long after Sibyl's birth.
I am persuaded that few, if any Indians, were brought in as slaves, after the act of 1682; especially of those captured in war. The statutes, as might be expected, notify us of all the Indian wars, in which Virginia was engaged, of the wars of 1623, 1629, 1631, 1632, 1644, 1654, 1675, 1676, and 1677. After the war terminating in 1677, we find no traces of an Indian war, until 1754, when the war with the French and Western Indians began. The war of 1675 was a general one, with all the Indians in our neighbourhood, and ended in 1677, in the total subjection of all the Indian tribes, within the limits of Virginia, on this side of the Alleghany, who submitted to be tributaries, and by our laws, (1705, 3 Hen. Stat. at Large, 467,) were protected in their persons, goods and properties. Those tributary Indians, therefore, could not be made slaves legally, and there was not the least probability, that, in the teeth of this legal guarantee, any attempt would be made to reduce one of them to slavery. As to the more.remote Indians, not tributaries, the Five Nations seem to have been the only Indians, with whom we had any intercourse or misunderstanding. They having wars with divers nations of the Southern Indians for many years, took their marches along the frontiers of the colony, and committed many robberies and hostilities. A treaty was made with them in 1722, 4 Hen. Stat. at Large, 103, by which they stipulated not to cross the Potomac, or to pass to the eastward of the great mountains; and our tributary Indians agreed not to pass over the Potomac or to the west of the great mountains, without licenses respectively from the Governors of Virginia and New York; and it was enacted, Ibid. 104, that any tributary Indians violating this treaty should be transported to the West Indies, and sold for slaves. In 1711, 4 Hen. Stat. at Large, I, to restrain disorderly and barbarous Indians frequenting our frontiers, Rangers were appointed; and it was enacted, that if any *634 Indian, of any nation at war with us, was taken by the Rangers, he should be transported, and sold for the bene» fit of the Rangers.
From-all this, .and particularly from the provision for transporting to the West Indies those who were to be made slaves, instead of keeping them here, I think but few, if any American Indians, were enslaved here, after the great Indian war of 1675.
As to those who might be held to involuntary service at the time Sibyl was probably born, they consisted of those who were bound to service until thirty years of age, under the act of 1670, which was repealed by the act of 1682; (and all those must have been free in 1712;) and the children of the females of these by a negro or mulatto, born during the mother’s time of- service, and after the passing of the act of 1705, who were to be bound out until the age of thirty-one; and by the act of 1723, the children of those children, born whilst the mother was bound to service, and so their children in all generations, were bound to service until their ages of thirty-one. Thei’e were also other Indian servants, bound by their parents with the assent of two justices, until their age of twenty-five, or for a shorter time, under the acts of 1655 and 1657. The children of the females of these by a negro or mulatto, were bound to service until 31, by the act of 1705, if born during the time of their mother’s service; and the children of such children were bound to service till thirty-one, under the act of 1723, in like manner as the others. There could no longer be a class of Indians bound to involuntary service, (as English servants were bound) under the act of 1661. That act being repealed by the act'of 1670, would have been, as the law then was, revived by the repeal of the act of 1670 by that of 1682, if the latter act had not contained a provision directly against that of the act of 1661, providing that the very Indians directed by the act of 1661, to be bound as English servants, should be held as slaves.
*635 The question whether Sibyl was free or a slave, depends upon the facts, 1. Whether she was descended, in the maternal line, from a negro or an Indian. If from a negro, she was a slave; since her being, and always continuing in service, would have been utterly inconsistent with the supposition that her mother was free; for, a negro woman could at no time be bound to service, unless as a slave. 2. If from an Indian, Sibyl may either have been a slave, because her female ancestor might have been a slave; or free, but subjected to service until she attained her age of thirty-one years, because her mother might have been an Indian servant, bound to service until she attained the age of thirty years, or otherwise, as aforesaid; in which case, Sibyl’s being retained in involuntary service until her age of thirty-one, would not have been ineonsistent with her right to freedom, after she attained that age.
There is no direct evidence in relation to the quality or condition of the mother of Sibyl; and in the nature of things, there could be no such evidence. No written evidence ever existed, as to what Indians were slaves, and what servants; nor as to the descent of any child from an Indian or negro mother; except that the church-wardens bound, by indentures, the-children of Indian servants by a negro or mulatto, till the age of thirty-one, and the Indian parents, with the approbation of two justices, bound their own children at pleasure, not longer than the age of twenty-five. But these indentures were not recorded, and remained either in the hands of the masters, or church-wardens, or justices, and not of the servant; and wherever left, were not likely to be preserved with any care. Such fugitive papers might naturally be expected to be lost within thirty years.
As to these facts, therefore, no direct evidence could be expected to exist, but only parol; and no such evidence could possibly exist, of facts of considerably more than one hundred years standing. Hoar-say and pro *636 sumptive evidence, therefore, (if any evidence at all was admissible in such a case) was necessarily to be admitted.
The questions, therefore, to be considered, are, 1. Whether any such hear-say and presumptive evidence was admissible in such a case as this; and 2. Whether the evidence offered in this case, was admissible or not.
The fundamental rule of evidence is, that the best evidence which the nature of the case will admit of, must be produced; and this rule is without exception. Another rule is, that no evidence can be received but upon oath; and this excludes hear-say evidence in general. But to this there are exceptions; in cases in which hear-say is not only the best, but the only evidence, which can, in the nature of things, exist. Thus, under the first rule, if the question be, whether an instrument of writing was executed or not; if there be a subscribing witness who is alive, and can be produced, no other evidence of the execution can be received but his testimony upon oath, not even the proof of the admission of the party. If the subscribing witness be dead, or cannot be produced, then the next best evidence is the proof of his hand-writing, which is therefore required and received. If the witness could not write, and his attestation was by a mark only, as no proof could be given of his hand-writing or his mark, the next best evidence is proof of the.hand-writing of the party, which is therefore required and received; and if the party was himself a marksman, so that1 neither his handwriting nor mark could be proved, then proof of his admission would be admissible. In Keeling v. Ball, 1 Peake’s Evid. Appendix, 184, it was held, that a bond, to which there were subscribing witnesses, being lost, and the names of the subscribing witnesses being forgotten, proof of the acknowledgement of the debt by the party, and his promise to .pay it, was held admissible and sufficient evidence of the execution of the bond; and proof that the bond was printed, and in the usual form, was held to be sufficient evidence that it bound the heirs„ But, in such a case, *637 evidence that a deceased person had said, that he heard the party acknowledge the debt, and promise to pay it, would not have been admissible, because the transaction being recent, the reasonable presumption would be, that if the bond ever had an existence, some direct proof must exist as to the fact; and nothing short of that direct proof would be admitted. But this objection does not exist as to matters, in relation to which, from their nature and antiquity, none but hear-say evidence can possibly exist.
Accordingly, hear-say evidence has always been admitted in questions of pedigree and legitimacy, and that not only as to the actual descent of the party in question, but as to the time of the marriage of the parents, and the birth of the child, and death of the parent or other relation; in questions of boundary and prescription, as of a right of way and other easements or services, and of modus; and not only as to the possession according to the right claimed, but also of the reputation of the existence of the right itself. In such cases, hear-say is admitted, when from the antiquity of the fact and other circumstances, it is not reasonable to suppose, that if the fact in truth existed, it could be otherwise proved. £ Peake, after laying down the rule that all evidence must be given upon oath, says, “ The few instances in which this general rule has been departed from, and in which hear-say evidence has been admitted, will be found, on examination, to be such as were in their very nature incapable of positive and direct proof. Of this kind are all those which can only depend on reputation. The excluding of hear-say in questions of pedigree, prescription, or custom, would prevent all testimony whatever; for, the evidence of any living witness of what passed within the short time of his own memory, would often be insufficient in the former instance, always in the latter; and there is no other way of knowing the evidence of deceased persons, than by the relation of others of what they have been heard to say. In these cases, therefore, the law departs from its general rule, and receives evidence of the *638 declarations of deceased persons, who, from their situation, were like to know the facts.” 1 Pealee’s Evid. 8, 9;and Bullet', in his Nisi Prius, p/294, says, “ So where the issue is on the legitimacy of the plaintiff or defendant, it seems the practice to admit evidence of what the parents have been heard to say, either as to their being or not being married; and with good reason,” &c. “So hear-say js good evidence to prove who is my grand-father, when he married, what children he had, &c. of which it is not reasonable to presume I had better evidence. So, to prove my father, mother, cousin, or other relation beyond the sea, dead; and the common reputation and belief of it, in the family, gives credit to such evidence; and for a stranger, it would be good evidence, if a person swore that a brother or other near relation had told him so, which relation is dead. So, in questions of prescription, it is allowable to give hear-say evidence, in order to prove general reputation; as when the issue was on the right of way, evidence was admitted of a conversation between persons not interested, then dead, wherein the right to the way was agreed.”
In two cases in Noy’s Rep. anon. 28, and Webb v. Pitts, 44, cited in 11 Vin. Abr. 118, pl. 2, 3, it was held, that common fame, proved by two witnesses, was sufficient to establish a modus; or proof by witnesses, “that for a long time, as they heard say, the occupiers of that farm had used to pay annually to the parson, 3s. 6d. for all tithes.”
In allowing hear-say evidence, the principle, as to the best evidence which the natui’e of the case will admit of, is applied; so that, in giving evidence of hear-say, as to pedigree, the reputation must come originally from a member or members of the family, who are more likely to know the truth, than a stranger. Vowles v. Young, 13 Ves. 140. The same rule, as to hear-say evidence, is found in the civil law. Domat, citing the texts of the civil law, 1 Dom. 456, sec. 14, lays it down thus: “ When the question is to prove an ancient fact, of which there are no writ *639 ten proofs nor living witnesses, if the fact be such as that it ought to be admitted to proof, as for instance, if the matter be to know how long an estate has been in a family, at what time a work was made, or other fact of the like nature, we receive the declarations which witnesses are able to make, of what they have heard concerning the said facts from other persons, who were then alive,” &c.
The evidence of hear-say and reputation are in effect the same, and stand upon the same principles, whenever admissible. Are hear-say and reputation, as to the descent and right to freedom of one claiming to be free, admissible in any case ? That they are admissible, as to descent, has been frequently decided in this Court; and upon the best reason. From the nature of the case, if the question arises after a great lapse of time, no better evidence can be presumed, or can possibly exist; and, upon this broad ground, the rule admitting such evidence is founded. In the questions of legitimacy, pedigree and prescription, it is admitted, not upon any ground of peculiarity in such questions, other than that such evidence is the only evidence which can exist in such cases; and when, owing to a state of things existing here, unknown in England, a new case arises in all respects like those to which this rule has been applied there, and turning upon the same reasoning, the principle of the law should be applied to such new ease. For the same reasons, reputation of the right to freedom may, in proper cases, be received, as the reputation of the right of way, and of a modus.
In all cases in which hear-say and reputation are offered in evidence, it is the province of the Court to determine, upon all the circumstances of the case, whether such evidence is admissible. If it be offered under circumstances, in which.it may fairly be presumed, that if the fact existed, better proofs of its existence might be produced, it should be rejected; or, if the evidence is so inconsistent with other circumstances, as to produce only a light presumption, it should be rejected as unfit to be left to the *640 jury, from which to presume the fact in issue. But, if nQ {jey.er evidence can be presumed to exist, if the fact existed, and if the evidence of hear-say or reputation be so consistent with. the other circumstances in proof, as to afford probable grounds to presume that the fact alleged existed; 'then it should go to the jury, to be weighed by them, pven if the Court should think that it was not sufficient to justify the jury in finding the fact affirmatively. Thus, in a question as to a right of way, if the right was alledged to have commenced recently, hear-say and reputation of right would be inadmissible, because it ought to be presumed, that if the right existed, there would be bettor proof of it; or, if the right was alledged to be ancient, and the possession had been long adverse to the right, such evidence ought not to be admitted against the possession. But, if the possession had been, as far as it could be traced, equivocal, the use of the way being interrupted, or if it were doubtful whether the use of it was permissive, or in the assertion of a right; such evidence might then be properly admitted, to remove the doubt.
So, in a question of slavery. If the claimant and his ancestors had béen immemorially held in slavery, and from their race could only be absolutely slaves or free, hear-say evidence, or reputation that they were entitled to their freedom, would afford so light a presumption of the fact, against the immemorial possession of them as slaves, as to be inadmissible. But, if the claimant was of a race, of*» which some might be absolute slaves, and some bound to service fi’om their birth, until they attained an'age considerably advanced, and the possession of them in service was equivocal, and might be the holding of them as slaves, or only as bound to service until a given age; then the ~ hear-say and reputation that they were entitled to their freedom after they attained the age to which they were bound to service, might be admissible. As in the case under consideration. The proofs not objected to, shewed that Sibyl was the child of a negro and an Indian, and was *641 kept in service all her life, and to an old age. Whether her mother was an Indian or a negro, was the first enquiry. The probabilities were precisely equal, upon the mere fact that she was half negro and half Indian. The circumstance that she was held in service, would have been calculated to induce a belief that her mother was a negro, if no descendant of an Indian woman could be a slave or servant by birth. The .circumstance that Indians might be slaves, and bastards by a negro or mulatto man and an Indian woman might be bound to service until they were 31 years old, is calculated to weigh on the other side, in the scale of probability; and, in deciding this question, I think the fact that Sibyl was called Indian Sibyl, and the reputation that she was entitled to be free, were admissible, and proper to be weighed by the jury, with the fact of her being held all her life in service, to determine whether her mother was an Indian or a negro; and if, as I suppose, the child of an Indian woman by a negro was considered and called an Indian, and the child of a negro woman by art Indian was considered and called a negro, both by our laws and in common parlance, at the time when Sibyl was called Indian Sibyl, the fact of her being so called, is proof of a reputation that her mother was an Indian. The legal distinction between the epithets Indian, negro, and mulatto, was probably then perfectly familiar, as many rights under the then existing laws, as that of 1733, depended upon the distinction; rights, which have long since ceased to exist, and the distinction consequently forgotten.
If, upon this evidence, the jury thought that Sibyl’s mother was a pure Indian, the next question would be, whether she was a slave or bound to service, until she at. tained the age of 30, under the act of 1670, or was bound to service by her parents, as aforesaid. On this question also, the continual possession of Sibyl and her children in service, would afford a presumption that her mother was a slave. On the other hand, the evidence as to the age of Sibyl gives reason to believe that she was born between *642 1705 and 1712; and if of an Indian woman, her father was a negro; in which case, if her mother was free, and hound to service till the age of thirty, and was not thirty years old at Sibyl’s birth, or was otherwise bound to service as aforesaid, the latter and all her children, and their children born before she and they were 31 years old, were born free, and bound to service until they attained thirty-one years of age. The presumption that Sibyl was born a slave, founded upon her being kept in service after she attained her age, is met by the proof that she was in 1770 reputed to be entitled to her freedom, which might be founded upon the knowledge that she was born of an Indian woman servant, and therefore entitled to be free at her age of thirty-one. This reputation in 1770, probably could not be founded upon any idea that she was free, merely because she was descended from an Indian woman. For the construction of the act of 1705, authorising a free trade with all Indians, and its consequences that all brought in after 1705, or rather after 1691, could not be held as slaves, was not probably known or thought of till 1777, ■or at least until after 1770. The presumption too of Sibyl being born a slave, from her being continued in service twenty or thirty years after she was thirty-one, is weakened by the consideration of her servile condition and ignorance from her birth, and the decisive power of her master over her. Upon the whole, I think that this evidence of the reputation that Sibyl was entitled to her freedom, should be left to the jury to be weighed by them, with all the other circumstances of the case, in order to determine whether Sibyl’s mother was an Indian, and if an Indian, whether she was a slave, or free woman bound to service, until her age of thirty years, or otherwise.
The Court erred in directing the jury to find for the plaintiff, if they believed that Sibyl’s mother was an Indian. It did not follow, if the mother was an Indian, that she was free. She might have been a slave; and in the absence of any other evidence, such as the reputation *643 that Sibyl was entitled to be free, I should think that the circumstance of Sibyl and her descendants being always held in service, would be conclusive to prove, by a violent presumption, that she was born a slave. But, upon the proofs in the cause, the fact (if the jury should think her mother was an Indian) whether she was a slave or free, though bound to service till her age of thirty or otherwise, should have been left to the jury, without any instruction as to the weight of the evidence.
The other branch of the instruction, mentioned in the second bill of exceptions, is also erroneous. Facts connected with the history of the country, must be proved as all other facts, by the evidence proper to prove them; as by books written on the subject, laws, records, letters or other documents, or even by well-supported tradition; the confidence in the facts alleged being regulated in degree, according to the nature of the proofs. This is only another instance of the application of the rules of law already discussed. Such proofs are admitted, because they are the best which, from the nature of the question, can be presumed to exist, and indeed the only proofs which can exist. It does not appear, that the fact that female Indians wrere more commonly captured and domesticated with us, than males, was proved in any way; but was only conjectured from the greater probability, which was supposed to exist, that the fact was so; and as to the time spoken of it does not appear what time that was. If it was a time subsequent to 1691, which was the only material time, upon a reference to the Statutes at Large, it does not appear that we had any war with any Indians after 1677, until 1754; whilst the same books give us distinct indications of many Indian wars before 1677. There was, therefore, no probability of any Indians being captured and domesticated by us after 1691. If the captures alluded to, were supposed to be made by our tributary Indians in war against Indians more remote, and the captives brought to us, then, from the same source, we have no in *644 formation of any wars carried on by them, except with the Five Nations, who marched southward to attack their enemies, and probably did not bring with them their wives and female children, to be captured. This instruction was calculated to influence the jury upon the preliminary question, whether Sibyl’s mother was an Indian or a negro. The conjecture that, from the nature of the subject, it was probable that more females than males were captured and domesticated, was too slight (if indeed the fair presumption was not the contrary) to be admitted as evidence, if it can be so called; or to have any effect whatever, on the decision of any of the questions in the cause.
I have treated the second exception, as properly taken, as I think it was. The Judge, if he had thought after the trial that he had mis-directed the jury, might ex-officio have set aside the verdict, and awarded a new trial. So, if he had doubted whether he had mis-directed or not, and if he thought it proper, upon all the circumstances of the case, to save that question to the party by signing a bill of exceptions, he might rightfully do so, although the party might have lost the strict right to claim it as legally due to him.
The judgment should be reversed, and the cause remanded, with instructions that upon the second trial, no such instruction shall be given to the jury as that contained in the second bill of exceptions; and that, if it shall appear that Sibyl was the child of a negro and an Indian, and was born after the passing of the act of 1705, the proof (if offered) of the reputation of the neighbourhood in which she lived, that she was entitled to her freedom, shall be admitted, not to prove that she was free, but to weigh as much as the jury shall think it ought to weigh in deciding the questions, whether Sibyl’s mother was an Indian or a negro, and if an Indian, whether she was a,slave or free.
*645 Judge Coalter.
In order to the better understanding of the questions involved in the case before ns, it becomes, in some measure, necessary to enquire into the early state of Indian slavery and servitude in this State. Fortunately, we have a better opportunity of doing this, than our predecessors, who had not the advantages of that valuable collection 'of our Statutes, which, under the title of “ Hening’s Sta~. tutes at Large,” has been furnished to us.
It was not until the year 1733, that an edition of our laws was published in Virginia. An abridgment by Beverley, was published in 1722, and a second edition thereof, in 1728. The collection by Purvis, is supposed to have been published between 1684 and 1687. All these were, published in London, and the last is said to have been very inaccurate. So that, at all events, up to 1684, the laws were promulgated here by manuscript copies, read to the people at the Courts, and a copy deposited in the Clerks’ offices. See preface to the 1st volume of Hening’s Statutes at Large, p. 5.
I mention these things now, because, in the progress of this enquiry, when I shall come to speak of the decision of the General Court, and of this Court, on the subject of Indian slavery, after the year 1691, I shall have occasion to remark, that probably those decisions would have been different, had the present compilation then existed. The result of my examination of the various acts, from 1655 up to 1676, to be found in the Is# vol. of Hen. Stat..at Large, p. 396, 410, 455, 481,• and vol. 2d, 143, 113 and 240, is this: That attempts had, in various ways been made to reduce Indians to slavery, as by encouraging Indians to steal Indian children and sell them, by importing them, and by purchasing them from the Kings of their country; all which were prohibited by law, except the last, which seems impliedly to have been sanctioned, by an act of 1661, declaring that a Powhatan Indian, who had been sold for *646 life, by the King of Wainoake, who had no power to sell him, being of another nation, and that, therefore, he should be free, he speaking perfectly the English tongue, and desiring baptism.
As to imported Indians, another act of 1661 declares, that they shall not be sold for any longer time than English of the like ages should serve by act of Assembly; which acts, as to English servants not indented, provided that they should serve for five years, if above 16 years of age, and all under, until 24; and by a subsequent act, that they should serve five years, if of 19 years old or above, and if under, until the age of 24.
Thus stood the laws until the year 1670; when, by an act entitled, an act “ what time Indians to serve,” 2 Hen. Stat. at Large, 283, it was enacted, that whereas some disputes have arisen, whether Indians, taken in war by any other nation, and by that nation sold to the English, are servants for life, or term of years, it is resolved and enacted, that all servants, not being Christians, imported into this colony by shipping, shall be slaves for their lives; but, what shall come by land, shall serve, if boys or girls, until 30 years of age; if men or women, 12 years and no longer. The enacting clause seems to drop the distinction between Indians and other pagans, and also, the circumstance of an Indian being captured in war by another nation; and, was doubtless intended to make a general provision, extending as well to Indians as other pagans imported by shipping. Although negroes had been brought into the country as slaves, by some Dutch ships, as early it is said as 1620, I see no law before this to justify their importation as slaves.
After this, until 1682, all Indians imported by shipping were slaves for life, those brought in by land were to serve until the age of 30; with this exception, that in order to encourage and reward our soldiers in time of war, it was provided by the acts of 1676, 1677, and 1679, that Indians taken in war should be slaves for life, and free pur *647 chase to our soldiers. 2 Hen. Stat. at Large, 346, 404, 440.
The next law in order of time is that of 1680, entitled, 44 an act allowing a free trade with the Indians;” by which it was enacted, that all former acts of Assembly restraining, limiting and forbidding trading with the Indians, be, and stand hereby repealed, and that henceforth there be a free and open trade for all persons, at all times and places, with our friendly Indians. Ibid. 480.
It becomes necessary here, to collate this act with that of 1696, entitled, 44 an act for a free trade with the Indians,” and that of 1705, on the same subject. 3 Hen. Stat. at Large, 69, 468. That of 1691, declares that all former clauses of former acts of Assembly, limiting, restraining and prohibiting trade with Indians, be, and stand repealed, and that from henceforth there be a free and open trade for all persons, at all times, and at all places, with all Indians whatever. This act of 1705, is verbatim with that of 1691, from the words, 44 there be a free and open trade,” to the end.
These acts, then, seem to be essentially and verbatim the same, except the words 4‘•friendly Indians,” in the first; and 44all Indians whatever,” in the two last, if that can be called a difference. Neither the act of 1691, nor that of 1705, could have been intended to permit a free and open trade, by people belonging to the colony, with Indians at war with the colony. All others, I presume, would come under the denomination of friendly Indians.
The edition of the laws of 1733, which was the first edition printed in this country, as above stated, and was published by order of the General Assembly, and is said to contain the titles of such acts as are expired or repealed, contains the titles of the acts of 1680, and 1691, above cited, and puts the word expired opposite the first, and repealed opposite the last, Ibid. S2, 44; referring to the act of 1705, ch. 53. Under the act of 1705, it is understood that the General Court in 1777, in the case of Hancock *648 and others v. Davis, decided that after 1705, no native American Indian could be made a slave. 1 Tuck. Black. part 2, Append. 47. This Court, in Jenkins v. Tom, 1 Wash. 123, and in Coleman v. Dick, Ibid. 233, decided the same thing.
In Pallas v. Hill, in this Court, 2 Hen. & Munf. 149, in consequence of a discovery of a manuscript copy of the act of 1691, above cited, the Court carried back the time when an Indian could not have been made a slave to 1691.
The act of 1680, which I have above cited, I presume was not known at the time of those decisions; for it is not hinted at either by Court or bar. If it had been before the Court, it would seem to me that the same principle would have carried the Court back to the year 1680.
But, whatever might be the legal effect of this law declaring a free trade, did the Legislature intend that it should alter the law in relation to Indian slavery ? It seems to me clearly, that it did not; and that this law was not intended to operate on the act of 1670, above mentioned. Fori find that two years after, to wit: in 1682, by an act entitled, “an act to repeal a former law making Indians and others free,5’ it is recited, that “whereas, by the 12th act of Assembly of 1670, entitled ‘ an act declaring who shall be slaves,” it is enacted that all servants, not being Christians, being imported into this country by shipping, shall be slaves; but what shall come by land shall serve, boys and girls until 30, and men and women for 12 years. It then goes on to recite, that “ many Moors, mulattoes, negroes, and others, bom in heathenish and pagan countries, have heretofore and may hereafter be purchased or obtained as slaves from their native country, by well disposed Christians, who may have converted them to Christianity, which by law does not manumit or make them free here, and as it often happens that such owner may be enforced to bring or send such slaves here, to sell or dispose of them, and will be obliged to carry them back, or send them to some other place, if they should be obliged to sell them *649 here for no longer time than the English or other Christian is to serve; and whereas also, those Indians that are taken in war or otherwise, by our neighbouring Indians, confederates or tributaries, are slaves to those Indians which take them, and by them are likewise sold here as slaves;” it is enacted that the act of 1670, be and is repealed, &c. and further, “that all servants, except Turks and. Moors, whilst in amity, &c. which from and after publication of this act, shall be brought or imported into this country, either by sea or land, whether negroes, mulattoes, Moors, or Indians, who, and whose parentage or native country are not Christian at the time of the first purchase, though after and before their importation they be converted to Christianity, and all Indians which shall hereafter be sold by our neighbouring Indians, or any other trafficing with us, as for slaves, are hereby declared slaves.” 3 Hen. Slat, at Large, 490.
The act of 1670, above, bore several titles. The title given in Hening’s Statutes, as cited above, is, “What time Indians shall serve.” In the act of 1082, and in the edition of 1733, and elsewhere, it is entitled, “an act declaring who shall be slaves.” It was certainly, however, considered a statute restrictive of the power of making Indian slaves; as for instance, in case of importations by land, whether by traders or neighbouring Indians, who bad taken them in war, and who, by the act of 1670, were to serve only for a term of years, but who, by the act of 1682, are to be slaves. Now, the act of 1680, allowing a’free trade, cannot be supposed as intended to repeal the act of 1670, as to Indians imported, as seems evident by the act of 1682 above, which extends the right of making slaves of Indians, far beyond the act of 1670. If, then, the acts of 1680 and 1682, had been before this Court in the decision of the case last mentioned, it seems to me it would have afforded strong ground for a contrary decision. Nor can I perceive any thing in that part of the act of 1705 which declares a free trade, which would have warranted the *650 judgment of the General Court above cited, if they had had jaw.s apove mentioned before them. For it is to be remarked, that even that act, in declaring who shall be slaves, though it takes perhaps a middle ground between the act of 1670 and that of 1682 above noticed, still extends the right to make Indian slaves beyond the act of 1670. It declares that all servants imported and brought into this country by sea or land, who were not Christians in their native country, except Turks and Moors in amity Sic. and others who can make due proof of their being free in England or any other Christian country, before they were shipped in order to transportation hither,' shall be accounted slaves, notwithstanding a conversion to Christianity afterwards. This law, then, which is enacted at the same session with the act of 1705, ch. 52, allowing a free trade as aforesaid, is broader in its operation than the act of 1670, under which, undoubtedly, Indians imported in ships could be made slaves; inasmuch as by this, whether imported by sea or land, they could be made slaves. Now Turks, Moors or negroes could not be brought in by land, so that this part of the law could only relate to Indians. At all events, I am so well satisfied, that, viewing all the laws together, (as we are now enabled to do) that there is some ground to question the propriety of those decisions, I think the Court ought to do nothing which would enlarge the claims to freedom under them.
When Indians captured in war, either by our soldiers or by other nations, ceased to be brought in as slaves, or when traders and others ceased to bring them in, it is not easy, at this day, to conjecture. It doubtless, gradually ceased in practice, as our friendly relations with them extended; to which, perhaps, the clause in’ the act of 1705, ch. 52, 3 Hen. Stat. at Large, 467, contributed; by which it is enacted, that Indians, tributary to this government, shall be secured and defended in their persons, goods and properties; and that whosoever shall defraud or take from them their goods, or do hurt or injury to their persons, shall *651 make satisfaction, and be punished for the same, according to law, as if the Indian sufferer had been an Englishman. As this, however, did not extend to all Indians, those not tributary would seem to be left as theretofore. I think, however, without any direct repeal of the laws, the practice had probably ceased before 1711; for, by a statute then made, providing for Rangers, &c. they are authorised to apprehend any Indian, have him examined, &c. and if it turns out that he belongs to any of the nations at war with this government, he shall be transported for the benefit of the party of Rangers. 4 Hen Stat. at Large, 10. So too, by the act of 1722, 4 Hen. Stat. at Large, 104, any tributary Indians, or Indians belonging to the Five Nations, are not to pass certain bounds, &c, and if they do, they shall suffer death or be transported to t.he West. Indies, and there sold as slaves. If it had then been the habit to make slaves of Indians here, I see no particular reason why these should be transported.
Before proceeding to examine the remaining acts on the subject of Indians bound to service for a term of years, it may be proper to make some remarks on the grounds, on which the plaintiff claims his freedom, and which have been fully stated by the Judges who have preceded me. These must be proved, in order to support the plaintiff’s action.
Smith, the witness, whose deposition was taken in 1820, and who was then about 70 years of age, testifies that when he was between seven and ten years old, (say between 1757 and 1760) he knew a yellow woman in the family of Peter Ashbrooke, called Ashbrooke’s old Sibyl or Indian Sibyl, who had every appearance of an Indian: that she had several children, one named Biddy, and one by the name of Jenny, which he recollects. She had long, straight, black hair, and he was under the impression that she was of Indian descent.
In the year 1758,"or 1760, then, Sibyl had acquired the appellation of old Sibyl, had a number of children, and *652 bad been and continued, during her life, to be held in slavery, as her progeny has been ever since. To what number they now amount, is unknown; but one of them has sued f°r his freedom. It is not probable that she acquired the appellation of old, much under fifty years of age, and consequently was probably born as early as the year 1710. This, however, must be altogether conjecture.' Whether she was the first only, or any other child of her mother, does not appear by any direct evidence, any more than whether that mother was a negro or Indian.
But, if the jury were satisfied that' her mother was an Indian, did that of itself and without any proof whatever of the condition of that mother, throw the burthen of proof on the defendant, to shew that she was a slave ? It seems to me that it would not. She might have been brought into the country, even before 1680, and then have been about thirty years of age when Sibyl was born.
In all the cases above referred to, in the General Court and this Court, I understand the plaintiff not only proved Indian blood, but also, by hear-say or otherwise, that the importation of the mother-stock was, in all the cases but one, since 1705, and in that one, since 1691. Accordingly, in this case, the plaintiff offered to prove that in the life-time of Sibyl, viz: about the year 1770, it was currently said and believed in the neighbourhood, that she was entitled to her freedom. -This evidence was objected to; “but the Court was of opinion, that though it was not legal evidence to prove the affirmative position that Sibyl toas free, it was legal and proper evidence, as a circumstance with others, to aid the jury in deciding, whether the African mixture in Sibyl came from the father or mother, and for that purpose only, and to have such weight as the jury deemed it entitled to.”
If it was to have no other bearing; if it was to be no proof whatever of the condition of that mother, further than that she was an Indian, and it was intended to be so restricted; was it a circumstance to prove that her mother *653 was an Indian ? In wbat way would it simply conduce to prove this, and this only, more than that her father was an Indian ? In no way that I can perceive, except in this: that a report that Sibyl was entitled to freedom, if it can be connected with, or considered as having its origin in, the fact that she was born free, then, as it would be more likely that such a report and belief should exist, in case her mother was an Indian; than it would, in ease she was a negro, the jury might weigh it, and determine that her mother was an Indian; but unconnected with her title to freedom by birth, I cannot perceive that it was entitled to any weight. If we say that though it may be admitted, that the report and belief did not arise from any knowledge of the party raising it, that her mother was free, but that it arose from a mere conjecture that, as she had Indian blood she may have been free, and of course Sibyl free also; and that, in this way, without having any weight or being entitled to any, as to the freedom of the mother, it might be a circumstance to shew that Sibyl’s mother was an Indian, and that only; I think it would behove us well to consider whether hearsay of a title to freedom, resting on mere conjecture, and not on a knowledge of the facts necessary to give such title, would be at all admissible for any purpose ? I think it would not.
All hearsay or reputation, to be evidence, must proceed from those who knew the fact itself, and could prove it, if in Court; for, if they were examined in Court, and only proved a conjecture or a vague.opinion, arising from facts not sufficient to support the belief, the facts only, and not the conclusion or belief, would be evidence. The evidence, then, in order to prove any thing at all as to Sibyl’s mother being an Indian, must, it seems to me, be permitted to go further, and to prove that she got her freedom from her mother; that is, that her mother was a free Indian. For, if the jury ought not to have been permitted, and were not permitted, to consider that it was more likely that the mother of Sibyl would be free, if an *654 Indian, than if she was a negro, then the evidence would prove nothing as to the condition of the mother, and was only calculated to confuse and embarrass the jury. If, in either case, the mother was equally to be considered a slave, until proved to be otherwise, by other evidence than this report, then it was as easy to believe that Sibyl might be entitled to her freedom as the daughter of a free negro woman, as of a free Indian woman. But, as it could not be legal evidence, (restricted as the literal construction would seem to restrict it,) and as it could not, so restricted, tend to prove that Sibyl’s mother was an Indian, and could only do so by its collateral operation on the question of freedom in her mother, was it proper to be admitted for this double purpose, not only to weigh as a probable circumstance to prove that the mother was an Indian, but that she was a free Indian? If it would, then we would not reverse, for the apparent restriction of the evidence to one point when it might have been explicitly admitted for both objects.
Was it properly admitted, or might it have been properly admitted for both objects? Why would it be evidence of both propositions ? Because it is said, that unless her mother was not only an Indian, but a free Indian, such report and belief could not have had existence. The evidence, then, must prove first and mainly, that the mother was a free Indian; and if she was, it was not a matter of proof but of law that Sibyl, following her condition, would be free also. What would this be more than to prove directly by this report, that Sibyl was entitled to her freedom ? And if so, why could not the jury as well say that this report arose because her mother was a free negro; for, if this was the fact, it would equally justify the report? But, no. It is not as probable that a report would arise from that fact, as from the other, that she was an Indian. Why so ? All reports ought to originate in a known fact, sufficient to prove the title resting on it, if the fact itself was given in evidence; and when a report may have arisen from the ex *655 istence either of one fact or another, either of which would be sufficient to support the title claimed under that report, and we have no evidence on which of the facts it was founded, by what authority do we set a jury to conjecturing on which of those facts the author or authors of the report founded their opinion ? There is no hear-say or reputation, or other evidence, that Sibyl’s mother was free, except insomuch that if Sibyl was entitled to freedom, it may be that she was entitled by birth; but, it also may be.■ that she was entitled to it otherwise. The authors of the report have not stated on what foundation they placed her title to freedom; and as it was not necessary to have birth for its foundation, there is no proof, by hear-say or otherwise, of any fact from which title to freedom in the mother can be deduced. Indian blood, no more than white blood, can give that title. Beyond this, we have no evidence, except a report that, in some way or other, she was entitled to freedom. If a witness had sworn that he believed her entitled to her freedom, (and this is the amount of the report,) it would not be enough. He must say on what ground he believed it; for, that might not have justified such belief. How can hear-say, then, be evidence, when, if what was said, and is so detailed, had been given in evidence by those who had said so, it would not be received ? There is no hear-say of neighbours, that they knew Sibyl’s mother, or her condition; the hear-say .is as to Sibyl herself. They probably knew more about her than her mother; and as they say nothing of the latter, they may have known something by which Sibyl was entitled to freedom, though her mother might have been a slave. All this is conjecture; and I fear, that to admit such evidence, would be going very wide of the legitimate limits, within which hear-say evidence is proper.
But, if admitted at all, it would seem to me more reasonable that a report and belief that Sibyl was entitled to freedom, should be received directly to prove that she herself was free, than to prove that her mother was free, *656 who might have been a slave, and yet Sibyl be free. For, it does not follow, as the jury were permitted to suppose, that because Sibyl was half Indian, and entitled to freedom, her mother must have been a free Indian woman.
It seems to me, then, that we are brought back to the enquiry; was the Judge right in saying, that this was not legal evidence to prove that Sibyl herself was free ? Surely he must have been right on that point. It would be going too far to say, that after the lapse of more than a century, during all which time a woman and her descendants have been held in slavery, that those descendants should be considered as entitled to freedom in consequence of a report and belief in the neighbourhood, that their mother was entitled to her freedom, though she was held all her life as a slave; without any evidence, heur-say or other, from what fact such belief originated. It is impossible to contradict so vague a report. No fact is stated as being reported, nor is any one named as the author of the report; nor is there any thing, concerning which a Court can judge. They must be left to their own conjectures as to the grounds on which such a report has obtained circulation.
But, suppose the jury have arrived at the belief that Sibyl’s mother was an Indian; still, the plaintiff must produce some proof that she was a free Indian, or such a strong probability of it, as to throw the burthen on the defendant to prove that she was a slave. . Could the plaintiff then say, “I have produced evidence to satisfy the jury that her mother was an Indian: that she must have been in the country prior to 1710, as Sibyl may have been born about that time; and although it does not appear how or when she came into the country, yet, as Sibyl, about 60 years thereafter, was reported to be entitled to her freedom, I have a right to insist that it was so reported, on this ground, to wit: that her mother was an Indian woman servant, not a slave: that she had a bastard child, Sibyl, by a negro man, and which child, though it ought to have been bound an apprentice, and to have her freedom recorded, *657 &c. was nevertheless held in slavery all her life, and her children after her, for more than a century; and that, though this long detention is entitled to some weight against me, and although I know nothing, and can prove nothing of the ground on which such a report was founded; yet, as it might have originated from the facts aforesaid, if the defendant cannot prove otherwise, the jury must find for me.” If such pretension would bp right, then the position for which I have above contended, to wit, that a belief that Sibyl was free, cannot prove that her mother was, which, in turn, is to prove that she was, is not correct. In short, I can view the subject in no way, in which I am not brought back to that point.
As to the acts of Assembly in relation to Indian servants, bound to service for a term of years, and that if Sibyl’s mother was such, and during the term of her service had a bastard child by a negro man, &c. I had intended to take a view of the acts of Assembly, and to express some doubts which have arisen in my mind, whether the act of 1705 which fines a woman servant 15/. or to be sold for five years, and the child bound until 31 years of age, was intended as any thing more than re-enacting the law on that subject, which theretofore existed, and which was confined to whites, and was intended, not to punish the crime of fornication, but to superadd thereto a heavy penalty, in order to prevent the contamination of the white blood. It is not necessary to pursue that enquiry; because, from the view I have taken above, it would not alter my opinion. It is not unworthy, however, of remark, that by the ancient laws, the church-wardens, at their meetings, were to make presentment of certain offences, and amongst others, that of fornication; and to return their presentments to Court, 1 Hen. Stat. at Large, 240; 2 Ditto, 49; 3 Ditto, 140; and that this was the law about the time when Sibyl was probably born. If, too, she was to be bound out until 31, then the records of the Court or church-wardens might shew a presentment or a binding out. 3 Hen. Stat. at *658 Large, 454. The act of 1705, (and I believe previous acts,) provides also for the recording of the freedom of servants. Now it may be, that none of these things were done, or that the records are lost, &c. But, there is no proof that they are lost; but, as the 15/. penalty, if it would be incurred in this case, went to the parish, it is not very likely that such offences would be overlooked'by the wardens.
Be all this, however, as it may, the Judge, as it appears by another exception hereafter mentioned, was of opinion, that if the jury were satisfied that Sibyl’s mother was an Indian, the plaintiff was entitled to recover; but, if he was not right as to this broad ground, as I have before stated, then the jury were to be satisfied from this hear-say report, 1. That Sibyl’s mother was an Indian; 2. That she was a free Indian held to service for a term of years; S. That during that time of service, she had a bastard child, Sibyl, by a negro man; 4. That that child was bound to service, under the act of 1705, until she was 31 years of age, and was continued to be held as a slave forever after, contrary to law; or, 5. That she was not bound, but held by the master of her mother, who, by the way, must, according to the above dates, have been free from that service very soon after the birth of Sibyl, and would probably have not permitted such injustice, but had her bound out. It does seem to me, that to permit all these suppositions to be found vs facts by a jury, on so vague a rumor, when that same rumor would as well justify the finding of certain other suppositions as facts equally sustaining the report, would be going too far. On the whole, I think this evidence ought not to have been received.
The second bill of exceptions sets out the application of the defendant to the Court, to instruct the jury, that though the evidence should have proved the plaintiff to be the son of Sibyl, who was half Indian and half negro, yet it was necessary that the plaintiff should prove that Sibyl was descended, in the maternal line, from an Indian wo *659 man. The Court gave that instruction, but went on to give further instructions, as has been stated by the other Judges.
I concur in the opinions which have been given, that both branches of the instruction so given and excepted to, were wrong.
The judgment must be reversed.*

 The President and Judge Cabf.ee, absent.